Weyer v. TAL Education Group Jason Kreutzer, on behalf of Appellants Edward Lea and Dios Asset Management, PTE Ltd. Jason Kreutzer, on behalf of Appellants Edward Lea and Dios Asset Management, PTE Ltd. Jason Kreutzer, on behalf of Appellants Edward Lea and Dios Asset Management, PTE Ltd. Jason Kreutzer, on behalf of Appellants Edward Lea and Dios Asset Management, PTE Ltd. Incidentally, is my voice coming over okay now? It's better. Yeah, it's much better. Yes, yours is perfect. So how is this going to work technologically? He's going to speak over the phone, but we're going to see his picture? That is correct. Sorry. But yes, you are correct, Judge Walker, there's a dial-up number they can use, and I spoke to Coke in the previous case, he may be doing the same. I think this is him now. Phone number started at 626, Mr. Young, was that you? This is Mr. Kreutzer, yeah. You sound kind of low. Jason Kreutzer, can you hear me? Yes. You would have to hold the phone closer to your mouth as you just did, though. We can still see you. If you want to speak on the phone, leave your video on, that's fine, but please hold the phone closer to your mouth. Is this better? Yes. Perfect. Okay. So this is Jason Kreutzer on behalf of Appellants Edward Lea and Dios Asset Management, PTE Limited. The first issue that I'd like to discuss with the court are the GZ one-on-one transactions and the factual allegations supporting strong inference that those transactions constituted an illicit asset parking arrangement. The term asset parking refers to a situation in which one company conveys an asset to another company with a prearranged plan to reacquire the asset. The most well-known example of this is when Enron sold an interest in electricity charging generating barges in Nigeria to Merrill Lynch with a secret side deal to repurchase them, which allowed Enron to improperly record earnings in connection with the sale, even though the risk of ownership never passed. In many ways, asset parking is analogous to revenue round tripping in that the form of the transaction may allow a company to satisfy all of the formal requirements of revenue recognition, but revenue recognition is still improper because it's the substance of the transaction, not the form that matters. Similarly, in an asset parking arrangement, a company may have executed a formal binding contract to sell an asset to a counterparty, but the recognition of an accounting gain would still be improper because the parties have made a side deal for the asset to be reacquired at a future date. And that is precisely what we allege happened here with the purported sale of GZ one-on-one to changing education. Apart from the conclusion, counsel, apart from the conclusion that there must have been a side deal, is there anything specific in the complaint, any factual support for that particular assertion? We don't allege any direct evidence of a side deal. So we don't, for example, allege that we have a copy of the agreement or that there's a confidential witness who will attest to its terms. It's based on circumstantial evidence that the structure of the deal and the circumstances surrounding what happened afterwards with the transaction support the conclusion that that's what happened in this case. And so the first thing to look at is the structure and the mechanics of the transaction. And Paul claims that it transferred the GZ one-on-one business unit to changing education in August, 2015, in exchange for $50 million of changing education, redeemable preferred shares, and then reacquired GZ one-on-one in November, 2016, in exchange for canceling those shares. So the net effect of these transactions are that both tall and changing ended up exactly where they were before the transactions, except that tall recorded a $50 million gain. The only reason that tall gave the reacquisition was it changing had believed that GZ one-on-one no longer fits well with its overall business strategy. But tall never explained why it wanted GZ one-on-one back, much less for the same price at which it just sold it a year ago. Now, tall told the district court below that an independent valuation appraiser, quote, value GZ one-on-one at $50 million, close quote, at the time of reacquisition. And that's on page 530 of the appendix. But in the form 20F that tall filed, tall did not say that the appraiser assisted with determining the purchase price, but only that it determined the purchase price allocation, which means that the purchase price had been determined, and the appraiser helped allocate the components of that into various categories like goodwill and other intangible assets. These facts on their face are suspicious, just as it would be suspicious if company A sold $50 million of consulting services to company B, and company B simultaneously sold $50 million of consulting services to company A, and they both recognized $50 million in revenue. Such a transaction could be legitimate. It could be perfectly legitimate. But on its face, those facts are suggestive of revenue round-tripping. And here, these facts, the bare mechanics of the transaction are suggestive of an asset parking arrangement. Council, what do you say to the other sides pointing out that there were advanced tuition payments that were transferred to, I don't know how to pronounce it, Chongqing Edu, and also teacher contracts and agreements. So there was a process of effectively transferring assets as well as just the ownership. And that's a sort of a different kind of a situation, it seems to me. Unless, you know, I think that evidence, you know, I suppose you could, if there was a scheme, it could be part of the scheme, but it also could easily indicate that this was a legitimate sale, in effect. So I'll address first the question you had about with respect to the deferred liabilities account. And there's two points that I want to raise with this because I think there's been some confusion with the use of the term deferred revenues. Deferred revenues is a liability account. It's not an asset, it's a liability, and it relates to the obligation to provide services to students that have already paid. And so there's a question of, first of all, whether or not Tal removed the deferred revenue liabilities from his balance sheet. And secondly, whether it actually moved over the cash. And frankly here, this is something where I would urge the court to look at the page of the records at the defendant's site. It's page 196 of the appendix. And what Tal says that that page supports is it supports the conclusion that Tal did in fact transfer the advance payments from GZ 101 to Changing Education and that it did transfer the obligation to providing the tutoring services to its students. But if you look at that, that's not what it says at all. What it says is that there are amounts due to related parties. And it says that as of the date of February 29, 2016, there was still over $4.2 million that was owed to related parties. Now, by the way, it doesn't specifically mention Changing, but that was a representation that Tal made to the district court on the motion to dismiss briefing that that's what it referred to. But it doesn't say anything about actually having transferred any payments, and it doesn't say anything about actually having transferred the obligations. If you do a reconciliation of Tal's balance sheet, it shows that none of the deferred revenues were actually removed from its balance sheet. And so this supports the conclusion that what was going on here was that Tal was having this separate account where it's saying this is the amount that we still owe you, and it's going to be settled at some future date. That's not what would happen in a normal sale. of a business unit, a company would remove the assets and liabilities of the sole business component from its balance sheet, but instead sort of held these in a band. And also Tal represented to the district court that what it was doing was it was offsetting lease payments that it was making. So it's saying we're going to pay certain amounts for your leases. Again, none of this is actually in the financial statements. These are from representations the defendant made in its court filings. But this way of accounting for it, which is not to actually remove the liabilities from its balance sheet, instead to say we owe you this money, that's consistent with structuring a transaction in a way to make it easy to reverse. It's basically an IOU, and then when they reacquire the company, it's just wiped out. So we think that actually the evidence with respect to the deferred revenue strongly supports the claim that in fact that there was never a real bona fide transfer. Now, I think the other piece of your question had to do with future contracts. And lease agreements. And lease agreements. I'm sorry? Lease agreements. So with respect to the lease agreement. And teacher contracts. Yeah, yeah, yeah. So I guess with respect to the lease agreements first, we have evidence that at least one of the lease agreements was not transferred. That's something that was obtained from a court record to the Chinese lawsuit. And the defendants acknowledged that this particular lease was not transferred. And they say the reason that this lease was not transferred was that they weren't legally able to transfer this lease. And in addition to that, Muddy Waters interviewed a former manager at Changing Education who said that few of the leases of the learning centers have been transferred. Defendants attempted to rebut this by introducing three agreements with respect to three of the leases for these learning centers. And one of those leases transferred the lease from Tall Education to Changing Education. And two of them just terminated the lease. Now, we raised a series of objections as to why these agreements should not be considered by the court. But putting that aside for a moment, assume you accept this. There are 10 learning centers. And so there are evidence that they're trying to disprove this allegation was that they got terminated. So the question is, what happened to the other seven? And based on the allegations that we have, where they clearly continue to pay on one of the leases, where a former employee has indicated that they didn't transfer most of these leases, the most plausible inference from these facts is that they didn't transfer the other seven out of the 10 leases. I think in the complaint, didn't you also allege that two teachers said that their salaries continue to be paid by TAL during this period as well on that issue? That's correct. And again, the defendants tried to rebut this by introducing some evidence showing that some of the teacher contracts. And again, we disputed the authenticity of these. The courts did not accept judicial notice of these documents. But assume that you do accept them. What Muddy Waters said was that a number of these staff contracts were transferred over to give this deal the illusion of substance. And so the fact that a handful of teacher contracts were transferred over doesn't rebut the allegations. And so what we have here is we have leases that weren't transferred. We have teacher contracts were not transferred. Salary was continued to be paid by TAL Education. You've got a suspicious transaction structure. You have these deferred revenues that were not actually removed from the balance sheet. And the totality of those factors all support a conclusion that this was not a bona fide transfer. And in fact, it never was really conveyed that it was done in this manner to make the transaction easy to reverse. Additional evidence of asset parking. One is that for a year after the supposed transaction, there were new job ads for hiring that were posted. And the response, the email addresses for those ads, the response emails were from TAL Education. And that's suggestive that TAL continued to make hiring decisions for this company after the transaction occurred. The other thing that I that's important that I had not mentioned yet was was with respect to Shugia. Shugia was the subsidiary that that Changing Education had created to receive the GZ101 business. And following the supposed sale of GZ101 and Changing Education, Lin Jiangxu, I'm sure I'm pronouncing that incorrectly. He was a senior TAL manager. He became the executive director and legal representative of Shugia, and he acquired a 10 percent stake in Shugia for just one renminbi, which is approximately 15 cents. So this individual was given a 10 percent ownership interest in a company holding an asset worth 50 million dollars for 50 cents. So the defendants say that they had an incentive. You know, it's normal in a corporate reorganization for the managerial staff to move over and they would have had an incentive to hire this guy because he was this superstar teacher. Assume all that's true. Assume that this 10 percent stake was a signing bonus. When the company got reconveyed back to TAL Education, Lin sold his 10 percent stake in Shugia back for one renminbi. And so, you know, he relinquished this signing bonus for nothing. That's very suspicious. The most plausible interpretation from those facts is that this was all a pre-planned arrangement, that he was acting as an agent. Shugia filed SAIC filings, those were Chinese regulatory filings, in 2015 and 2016 using a TAL email address as the contact email for Shugia. And again, the defendants say that the migration of, you know, electronic systems takes a while. But this wasn't email addresses for easy one-on-one. It was for Shugia. It was a subsidiary of Changing Education that was created by Changing Education to receive this entity. And it's filing regulatory filings saying that it's official contact emails from TAL Education. All of these factors are highly suspicious and they support an inference that is at least as plausible as the competing inference that this was just a legitimate business deal. At the end of the year, they decided, okay, it's not working out, so let's just reverse the transaction by canceling these preferred shares at the exact same price that we did the transaction a year earlier. All right, Mr. Kraser. I think your time is up, but you did reserve two minutes for rebuttal. Thank you. Okay. All right, Mr. Fumerton, you're up. Good morning, your honors, and may it please the court. Robert Plummerton, Skadden Arps for defendant Appellee TAL. Your honors, Judge Preska correctly dismissed plaintiff's amended complaint with prejudice based on two grounds, plaintiff's failure to allege any misstatement or omission and their failure to allege any facts giving rise to a strong inference of scienter. I'd like to begin with the falsity prong and plaintiff's first claim of fraud, which we just heard about, which is that TAL misled investors by reporting this $50 million it tutoring business to the changing company. Now, plaintiffs, and this is important, do not allege any facts demonstrating that the sale didn't take place or was not fully disclosed. Their entire theory of fraud is predicated on their contention that even after the sale, TAL continued to control GZ, and thus the sale was what counsel referred to as asset parking or was a sham. But as Judge Walker alluded to, none of the facts plaintiffs allege in the amended complaint demonstrate that TAL continued to control this entity after the sale. To the contrary, several of plaintiff's well-pledged factual allegations and the documents incorporated by reference contradict the claim that the sale was not legitimate. Judge Walker referred to the fact that TAL transferred advanced tuition payments received from GZ students to the changing outfit, demonstrating that changing was assuming responsibility for providing GZ students with those services. This was disclosed. It was disclosed in the form 2016, the fiscal year 2016 form 20-F at A-196. Now, plaintiffs quibble that the disclosure wasn't specific enough or wasn't clear enough, but as Judge Preska correctly held, plaintiffs allege there was no evidence of a transfer of deferred revenue. We pointed to evidence, and the jurisdiction court correctly held that this disclosure does contradict the allegation that there was no evidence. And I think this is a broader point, Your Honors. It's not defendant's burden to prove anything on this motion to dismiss. Under the PSLRA and Rule 9b, plaintiffs have the burden to plead, particularize facts in support of their claim, and the record demonstrates TAL took numerous other steps reflecting a for the business to change in. Judge Walker alluded- Well, the inference doesn't have to be overwhelming. The issue is just whether it's a plausible inference, and plausible doesn't merely mean scanty, but I'm not sure I understand why the arguments that counsel has been making aren't enough to show, even if ostensible, even if management essentially was transferred, that there was a secret, undisclosed agreement for the reacquisition. All they need to show is that there was not full disclosure sufficient to make what was disclosed misleading of the terms of this sale, and if it was a sale with an understanding that it could be undone and reacquired on the same terms after the fact, that would be a sufficient false statement under the securities laws, no? That's correct, Judge LaValle, but there's no facts in support of that. As Judge Preska held, corporate reorganizations take time. They're not seamless. They have hiccups. Things get overlooked. Simple oversight, things get overlooked. Plaintiffs have alleged themselves. You don't need to take judicial notice of anything. They've alleged themselves certain lease agreements were transferred, as Judge Walker pointed out. Certain employment contracts were transferred, as plaintiffs themselves concede in their reply brief. The fact that every single lease and every single contract wasn't immediately transferred does not give rise to an inference of securities fraud. The more plausible inference, Judge LaValle, is this is a corporate transition, and things like this take time, and it's not seamless. And the same goes- Just putting aside the email, the use of the email and the contracts for a minute, there are some in here that don't relate to that it would take time to make a transition. I want you to address this point about the senior TAL executive who got 10% of the company for $0.50, and then I think was pointed out, even if that was some type of incentive bonus or something like that, got the same amount on his return back to the company. Can you explain that? Sure, Your Honor. Why would that be? Why would someone give up 10% of the company when they're coming back for the same $0.50? Right. So, Your Honor, the allegation is that TAL, that this Lynn was a star teacher, went over as part of the transition to the changing outfit, which, of course, is not unusual in any corporate transition. Not only are assets transferred, but people leave. And plaintiffs claim, with no factual support, that he was essentially a secret agent acting for TAL to maintain control over this entity. There's not a single fact in the complaint, even alleging that Lynn communicated with TAL ever during his tenure at the changing entity. That's just a superfluous thing. I mean, the main point being made is that it doesn't really matter whether he was a secret agent reporting back while he was during the period when the transfer appeared to be effectuated. The point was that when he got back, he did this highly suspicious thing of giving up a fortune for nothing. And why would he do that unless it was pursuant to a prior agreement that this would all be canceled after the fact? But, Your Honor, he didn't give up a fortune for nothing because he gave up equity in the subsidiary of changing, the SUGIA, that had no other assets. So once SUGIA sold the entity back to TAL, the equity was worthless. And it didn't happen immediately. It was about a year later. So let's step back here. What we have is an executive-offered incentive compensation, 10 percent equity. Then the entity is transferred back. So that 10 percent is worthless. And he gives it back. He's not giving up a fortune. But, Your Honor, these are the actions of third parties. These aren't, this isn't my client. These aren't our defendants. It's not our burden, Your Honor, to explain every action that a third party takes in a corporate transaction. And again, stepping back, I mean, what's the benefit to TAL here? This allegation that we continue to pay leases, that we continue to pay contracts, there's no allegation that we continue to receive revenue from GZ during this transaction. Let me ask you about the financials. SUGIA's SAIC financials for 2015 and 2016 didn't reflect the consolidation of the financial results of GZ1 before it was sold back. Isn't that a potential? I know you have explanations for that. And the district court said there could be benign explanations. But again, as was pointed out by Judge LaValle, this is a motion to dismiss that if there's competing inferences and if you cumulatively rise to the level, even if one individually may not be sufficient, it should still go forward. What's the explanation for that? Why wouldn't it have been reflected on the financial results? It's not, Your Honor. Even if there were legitimate discrepancy between the Chinese regulatory filings of TAO, which of course are governed by different standards, different accounting standards, different regulations, there's no facts to show that SUGIA's filings were correct and TAO's were incorrect, as opposed to vice versa. And this court held in the Harris case in 2016, Harris v. Amtrust Financial Services, 649 Federal Appendix 7 at 10, that securities fraud cannot be inferred, cannot be inferred from discrepancies between, in that case, it was a defendant's SEC filings and its subsidiary regulatory filings. Here, we don't even have the defendant and its subsidiaries. We have the defendant's SEC filings and a third party's Chinese regulatory filings. The Harris case is squarely on point. That is not sufficient to state particularized facts demonstrating securities fraud. While we're on case authority, it just goes back to the old nature of the transaction as a whole, being suspicious. If you have a potential round-trip transaction where you have the asset going to another entity for a short period of time and then being transferred back, reacquired in the same amount, which case would you cite where there has been a transaction of that nature where a district court has dismissed, motion to dismiss, not on summary judgment, but on a motion to dismiss that said, even though that transaction itself may have the appearance of a round-trip transaction or an asset parking, whatever you want to call it, I'm going to dismiss this case. Do you have a case where that has been done? Your Honor, I don't, but I'm not aware of a case where a complaint's been sustained based on just sheer speculation that the fact that a company reacquired an entity more than a year later means it was a round-trip transaction. As the district court correctly held, there are all sorts of non-culpable inferences that reacquired the company. Changing was a mobile-based app, Your Honor, that matched tutors with prospective pupils. This GZ business was a brick-and-mortar business. As the companies disclosed, they didn't integrate the business well. There's other factors, changing economic circumstances, changing business needs. And Your Honor, this notion of the fact that it was purchased for the same price, I would think it would be more suspicious if it were purchased for a different price. It's only a year and a couple of months apart. Why would it be suspicious that the entity that changing apparently found that it couldn't integrate properly would want to sell it back for the same price? But Your Honor, the PSLRA and Rule 9b were designed to try to eliminate this pure speculation and just rank conjecture, giving rise to a claim for securities fraud. And Your Honor, that's just on the misstatement prong. They, of course, have to allege Sienter. And Sienter is a more rigorous standard under TELABS, where the court has to look at non-culpable inferences of intent and conclude that the inference of fraudulent intent is cogent and at least as compelling as the non-fraudulent inferences. Here, Your Honor, we think it's clear with respect to this GZ transition that the court concluded the much more plausible inference was that the sale of the business was legitimate but not seamless. It was not without hiccups. You had transfer of certain leases. You didn't have transfer of all the leases. Again, that happens in every corporate transaction. Same with employment contracts. Same with websites. Same with email addresses. All of these allegations could be leveled virtually every time there's a corporate transition. That can't be enough to establish a misstatement. It certainly can't be enough to establish under TELABS a Sienter. So, Your Honor, unless you have other questions, I see I'm over time. All right. Thank you very much, Mr. Fumerton. Mr. Kreischer, you have two minutes for your rebuttal. Okay, a few brief points. The first is I just want to emphasize that our allegations of falsity and our allegations of Sienter are based on the same principal facts. We're alleging that these are sham transactions and really our allegations of Sienter are going to rise or fall on whether or not we've adequately pled. That's why we pled falsity under the strong inference standard. The totality of the factors here, it's not any one factor. It's not the discrepancy between one of the SAIC filings and one of the SEC filings. We have a suspicious transaction structure. We have non-transfer leases, non-transfer employment contracts. We have this funny business going on with this employee who goes over and gives back his interest. The totality of these factors support a strong inference, an inference that is at least equally plausible to the competing inference that this was just sort of an innocent transaction that fell apart that says this was, in fact, an asset parking arrangement. With respect to Sienter, one of the comments that Mr. Pumich made was that what's the motive? I want to emphasize that, first of all, the Supreme Court has held multiple times in tell-abs in Matrix v. Sir Cusano that securities fraud plaintiff does not need to plead motive. It's clear also under the Second Circuit test that you can plead Sienter either through motive or an opportunity or through strong circumstantial evidence of conscious misbehavior or recklessness, and that's what we've done here. Furthermore, Tall Education is a foreign private issuer, which means that it's exempt from Section 16 of the Exchange Act, which means if there was insider trading going on from these defendants or their family members, they wouldn't be required to report that, so we don't know what's going on with that. Factors here support a strong inference that these individuals did, in fact, engage in this asset parking arrangement. And the last thing I want to say is with respect to leave to amend, and the only thing I'm going to say about that is that I would strongly encourage the court to take a close look, again, at Loralee Financing v. Wells Fargo, and that's not a PSLRA case. It's a case dealing with common law fraud claims under New York law, but the court there says that when you're dealing with these complex cases and the pleading with Sienter, which can involve these borderline subjective disputes, that really you need a court opinion, not just a briefing, but the court to give an opinion to the plaintiffs before you're going to dismiss them with prejudice. We did not have an opportunity to respond to Judge Preston's opinion. We did not have an opportunity to do oral argument before the court, and we think that at the very least, we should be given one more opportunity to plead fraud with greater specificity. We think that the current complaint adequately pleads securities fraud, but at the very least, we should not have been dismissed with prejudice. All right. Thank you very much to both of you. We will reserve decision. Thank you, Your Honor. Thank you.